UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
IN RE SKI TRAIN FIRE OF NOVEMBER      :
11, 2000 KAPRUN AUSTRIA,              :
                                      : MDL DOCKET #1428
                                      :    (SAS)(THK)
                                      :
                                      : **MEMORANDUM OPINION AND**
                                      :        **ORDER**
                                      :
                                      :
-----------------------------------------X
**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

This action arises out of a fire which occurred on a ski train

in the town of Kaprun, in Austria, in November 2000.  Although

Siemens AG Osterreich ("Siemens Austria") appears to have been

involved in the manufacture and/or installation of electrical

components on the train that caught fire, the District Court

(Scheindlin, J.) has  dismissed Siemens Austria as a defendant in

this action because it has insufficient jurisdictional contacts

with this District.  See In re Ski Train Fire in Kaprun, Austria on

Nov. 11, 2000, 230 F. Supp. 2d 403 (S.D.N.Y. 2002) ("Ski Train I").

Plaintiffs contend, however, that Siemens Germany ("Siemens AG"),

the  parent  company  of  Siemens  Austria,  supplied  electrical

components and systems to Siemens Austria for installation in the

Kaprun train.  Defendants deny this to be the case.  The District

Court has already determined that it has personal jurisdiction over

Siemens AG. See In re Ski Train Fire in Kaprun, Austria on Nov. 11,

2000, 230 F. Supp. 2d 376, 382-86 (S.D.N.Y. 2002) ("Ski Train II").

Plaintiffs  have  been  engaged  in  discovery  in  an  attempt  to

1

**COPIES MAILED
TO COUNSEL OF RECORD ON** 5/16/06


demonstrate Siemens AG's responsibility for the Kaprun fire. Presently before the Court is a motion brought by Plaintiffs for sanctions against Siemens AG and Siemens Corporation, the New York subsidiary of Siemens AG, and for an order compelling Siemens AG to produce documentary discovery and deposition witnesses.

I. Inadequacies in the Deponents' Testimony

The sanctions aspect of Plaintiffs' motion arises out of depositions taken in Munich, Germany of two witnesses who are employed by Siemens AG — Benno Grosser ("Grosser") and Walter Wilhelm ("Wilhelm").[1]  Plaintiffs contend that although these witnesses were proffered by Defendants to respond to various questions about the testing of the components that were installed on the Kaprun train, in fact, they had little role in such testing and could not respond meaningfully to Plaintiffs' deposition questions.  Plaintiffs therefore seek the costs incurred in taking the depositions as a sanction.  Defendants contend that the witnesses did provide responsive answers and that Plaintiffs' counsel merely failed to question them adequately on various topics about which they had relevant information.

The Court has reviewed those portions of the depositions that were submitted in support of the parties' positions,[2] and

_____

[1] Plaintiffs have not raised any issues with respect to a third deposition taken in Germany, that of Manfred Donz.

[2] Neither party has provided the complete transcripts of the depositions, so the Court must assume that other portions of the

concludes, in its discretion, that sanctions ought not be imposed on Siemens AG.

The noticed depositions were intended to elicit information about various electrical components that had been identified in Defendants' responses to Plaintiffs' interrogatories. In Plaintiffs' Interrogatory No. 1, Plaintiffs sought the identification of the components on the train that were manufactured, designed, installed or maintained by Siemens. In response, Siemens AG identified a list of components manufactured or designed by Siemens AG which may have been installed (but not by Siemens AG) on, or on the periphery of, the train. The response also included the locations where the components were likely manufactured, the individuals responsible for developing some of the components, and the years in which the components were likely to have been manufactured. In Interrogatory No. 5, Plaintiffs sought the name "of each person now or ever in the employ of Siemens who has had as a part of his or her duties evaluation or the review of the evaluation of the safety or the effectiveness of the components listed in response to Interrogatory No. 1." In response, Defendants identified Grosser and Wilhelm, and Plaintiffs subsequently noticed their depositions as fact witnesses. As Grosser and Wilhelm were not noticed as Rule 30(b)(6) witnesses, Plaintiffs did not identify any subjects on which it expected the

deposition were not viewed as relevant.

deponents to testify.

Plaintiffs now contend that Grosser and Wilhelm were improperly identified in Defendants' interrogatory response because they lacked any relevant knowledge about the testing of the components that were installed on the train. With respect to Wilhelm, Plaintiffs argue that the deposition was "virtually meaningless" because Wilhelm did not become head of Quality Control for Siemens AG until April of 2001, and therefore he did not have responsibility for evaluating or reviewing the quality control of products that may have been installed on the train in 1993 or 1994. (See Plaintiffs' Letter-Brief in Support of Sanctions, dated Jan. 19, 2006 ("Pls.' Brief"), at 5.)

Defendants contend that Plaintiffs' failure to secure information from the deponents is in large part due to Plaintiffs' failure to accept Defendants' position that "no one at Siemens AG had any responsibility for the design or installation of the train's electrical or communications systems nor can anyone at Siemens AG say for certain what components were used on or in association with the train." (Defendants' Response to Motion to Impose Sanctions, dated Feb. 15, 2006 ("Defs.' Response"), at 5.) As for Wilhelm, between 1983 and 1988, he worked in Siemens' Building Components Unit as a manufacturing planner, and then became head of the group for ensuring product quality. (See Deposition of Walter Wilhelm, dated Nov. 15, 2005 ("Wilhelm Dep."),

4

at 24.)  From 1989 through 2001, Wilhelm worked at Siemens A&D ET, which is a division of Siemens AG. (See id. at 20.)  In that position, Wilhelm initially was a quality expert engineer; he was subsequently given responsibility for certifying the business unit according to ISO 9001 standards, and for test planning.  As such, he had responsibility for securing the certification of miniature circuit breakers. (See id. at 21-22.)  Since 2001, Wilhelm has been the head of quality management for Siemens AG A&D CD.[3]  In that position, he is responsible for all issues of quality management and quality assurance (see id. at 13), and has general responsibility for overseeing the testing of the low voltage switching equipment which was identified in the response to Plaintiffs' Interrogatory No. 1. (See id. at 14-16.)  Wilhelm testified that each product manufactured by Siemens AG A&D CD is subject to a final test. (See id. at 16.)

Wilhelm initially stated that he was not involved in the evaluation of products that may have been installed on the Kaprun train. (See id. at 38.)  According to Wilhelm, in 1993 and 1994, when those components would have been installed on the train, he was not the head of quality control and did not have job responsibilities involving testing of products that may have been installed on the train. (See id.) However, later in his deposition,

---

[3] Siemens AG A&D CD is comprised of four subdivisions: CC, control components, DM, distribution boards, PD, power distribution, and MD, megatronic devices. (See id. at 15-16.)

Wilhelm confirmed that in the position he has held since 2001, he does have responsibility for evaluating items that were listed in response to Plaintiffs' Interrogatory No. 1. (See id. at 37-40; see also id. at 16, 51.)    Defendants assert that Wilhelm was prepared to discuss a myriad of subjects, including the type of testing performed by Siemens AG.  In his time at Siemens AG, he had contact with about 8,000 products. (See id. at 18.)

Mr. Grosser is an employee of Siemens AG who, since 1999, has been head of the research and development subdivision of the Automation Unit, which is a unit in the Automation and Drives Group, and is charged with developing systems tests. (See Deposition of Benno Grosser, dated Nov. 16, 2005 ("Grosser Dep."), at 10-13, 14, 16.)  Grosser's department does system tests on various equipment, among which is the programmable logic controller ("PLC").  From 1985 through 1999, Grosser served as head of the working group responsible for system tests and "type tests" for PLCs. (See id. at 23-24.)

In preparation for his deposition, Grosser had been provided with Defendants' response to Interrogatory No. 1, listing the components that may have been on the train.  Grosser identified the components on the list that people under his supervision would have tested. (See id. at 29-30.)  He acknowledged that there were items on the list which were not tested in his department. (See id. at 37.)    Grosser testified that he did not test the specific

6

components that were on the train, but would have done type testing of the components. Type testing is done before the product is released for manufacture. Once a product is being manufactured at Siemens, further testing is done in the manufacturing division. Grosser did not have responsibility for that testing. (See id. at 40-41, 45.) Defendants contend that Grosser had relevant information and was prepared to testify at greater length about the type of testing he did on components listed in response to Interrogatory No. 1.

Defendants argue that Plaintiffs' counsel simply failed to pursue relevant lines of questioning at both depositions, and that the vague nature of Plaintiffs' interrogatories caused Plaintiff to be frustrated with the deponents' responses. Defendants advised Plaintiffs that they were unaware of which components were actually on the train, and Plaintiffs failed to identify those components. Therefore, Defendants identified a long list of components that may have been on the train, as well as people who may have been involved in testing items on the list at some point in their careers at Siemens. They did not construe Plaintiffs' Interrogatory No. 5 as seeking to know who performed tests on specific lots of Siemens products, which may actually have been on the train. Rather, the interrogatory simply asked about individuals who were involved in testing of components that may have ended up on the train, and during 1993-1994, Grosser had

responsibility for testing prototypes of various components that may have been on the train. Thus, according to Defendants, Grosser and Wilhelm were involved in evaluating the "safety and effectiveness" of components that may have been on the train, which is the information Plaintiffs sought. (See Plaintiffs' Interrogatory No. 5 - "List the name, title and address of each person now or ever in the employ of Siemens who has had as a part of his or her duties evaluation or review of the evaluation of the safety or the effectiveness of any of the components listed in response to Interrogatory No. 1 above.".)

The Court does not view Defendants' conduct to be sanctionable. The deponents' knowledge and testimony (or potential testimony, had they been asked) was at least partially responsive to Plaintiffs' interrogatories. In asking about the "safety" and "effectiveness" of various electrical components that may have been on the train, Plaintiffs did not appear to be concerned with the precise components that literally were present on the train. Rather, it was reasonable to assume that they were seeking information about the developmental stages of the products, or information regarding testing of those components, regardless of when such testing occurred. Both of the deponents possessed some knowledge in that regard. The Court therefore concludes that Defendants should not be responsible for the costs incurred at the

depositions.[4]

Nevertheless, the deponents' testimony suggests that Defendants' response to Interrogatory No. 5 was not complete, since there may be other individuals who tested the relevant products at the manufacturing stage. Defendants should supplement their response to Interrogatory No. 5 if, after diligent inquiry, they are capable of identifying other individuals who may have been involved in testing the components which may have been installed on or in relation to the train. Any such response should be specific as to the role of the individual, the nature of the testing he/she was involved in, and the period of time that such testing occurred. Plaintiffs may then depose those individuals.

II. Scope of Production

The more substantive aspect of Plaintiffs' motion involves their demand that Defendant Siemens AG respond to Plaintiffs' interrogatories, document requests, and deposition demands, by producing information and individuals relevant to the discovery requests, regardless of whether that information is in the possession of, or those individuals are employed by, Siemens AG. Plaintiffs argue that Siemens AG is the 100% direct owner of Siemens Austria and, therefore, Siemens AG has the legal right and actual ability to secure such information and individuals from

---

[4] The most significant cost incurred, involving the trip to Germany, was necessary to depose Mr. Monz, whose testimony Plaintiffs have not challenged.

Siemens Austria, i.e., they are within the "control" of Siemens AG.

Defendants respond that Siemens AG and Siemens Austria are independent entities. They contend that Plaintiffs cannot demonstrate that Siemens AG has the requisite control over Siemens Austria so as to consider the documents and employees of Siemens Austria to be in the possession, custody, or control of Siemens AG. Defendants argue that Plaintiffs are seeking to evade the District Court's decision dismissing Siemens Austria as a Defendant, by viewing Siemens AG and Siemens Austria as a single entity subject to discovery. Finally, Defendants argue that the District Court has already concluded that Plaintiffs are capable of securing information from Siemens Austria through the normal channels of obtaining third-party discovery.

In its decision declining to certify for appeal the dismissal of Siemens Austria as a party, the District Court stated:

> Plaintiffs also contend that the dismissal of Siemens Austria from the case enables Siemens AG to prevent plaintiffs from uncovering the full scope of the joint participation of both [companies] in the disaster. Because plaintiffs have not explained why they cannot obtain third-party discovery from Siemens Austria, they have failed to point to a sufficient hardship or injustice, in the absence of an immediate appeal, to warrant 54(b) certification.

In re Ski Train, Nos. MDL 1428, 01 Civ. 6554 (SAS), 01 Civ. 7242 (SAS), 04 Civ. 1402 (SAS), 2005 WL 1523508, at *3 (S.D.N.Y. June 27, 2005) (internal quotation marks omitted). This Court does not view the District Court's statement as precluding discovery of

documents from Siemens AG, if those documents are in the custody of Siemens Austria. That question was never presented to Judge Scheindlin.

A. Document Production

It is axiomatic that a party is obligated to produce in response to document requests responsive documents that are in its "possession, custody, or control." Fed. R. Civ. P. 34(a). Courts have long construed the term "control" as meaning more than simple "possession." "Control has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought upon demand." Dietrich v. Bauer, No. 95 Civ. 7051 (RWS), 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000) (internal quotation marks omitted); see also Ssangyong Corp. v. Vida Shoes Int'l, Inc., No. 03 Civ. 5014 (KMW)(DFE), 2004 WL 1125659, at *3 (S.D.N.Y. May 20, 2004) (same); Twentieth Century Fox Film Corp. v. Marvel Enterps., No. 01 Civ. 3016 (AGS)(HB), 2002 WL 1835439, at *4 (S.D.N.Y. Aug. 8, 2002) (same); Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 146 (S.D.N.Y. 1997) (same); M.L.C., Inc. v. N. Am. Philips Corp., 109 F.R.D. 134, 136-37 (S.D.N.Y. 1986) (same); Hunter Douglas, Inc. v. Comfortex Corp., No. Civ. A. M8-85(WHP), 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999) (same).

Applying this test, many courts have concluded that the parent of a wholly-owned subsidiary is required to produce documents which its subsidiary possesses. A test commonly employed in the context

11

of a parent-subsidiary relationship suggests consideration of "the degree of ownership and control exercised by the parent over its subsidiary, a showing that the two entities operate as one, demonstrated access to documents in the ordinary course of business, and an agency relationship." Dietrich, 2000 WL 1171132, at *3 (quoting Desmeth v. Samsung Amer., Inc., No. 92 Civ. 3710 (LBS)(RLE), 1998 WL 74297, at *9 (S.D.N.Y. Feb. 20, 1998)); see also Koehler v. Bank of Bermuda, Ltd., No. M18-302, 931745 (MHD), 2003 WL 289640, at *8 (S.D.N.Y. Feb. 11, 2003) ("The applicable test under Rule 34 is whether the litigant has the ability to obtain the documents on request to a related party, either as a matter of law or as a matter of practical fact."); Ssangyong, 2004 WL 1125659, at *4 (same); Dietrich v. Bauer, 198 F.R.D. 397, 401-02 (S.D.N.Y. 2001) (corporation must produce documents of a wholly-owned subsidiary either because it has the legal right to secure such documents or the practical ability to obtain them); Florentia Contracting Corp. v. Resolution Trust Corp., No. 92 Civ. 1188 (PKL), 1993 WL 127187, at *3 (S.D.N.Y. Apr. 22, 1993) ("it is clear that the nonparty status of [] wholly owned subsidiaries does not shield their documents from production"); cf. Hunter Douglas, 1999 WL 14007, at *3 ("If the nature of the relationship between the parent and its affiliate is such that the affiliate can obtain documents from its foreign parent to assist itself in litigation, it must produce them for discovery purposes. The critical inquiry

12

is whether the affiliate can exercise custody and control over the documents. The test . . . is not limited to whether the corporation has the legal right to the documents.").

Defendants contend that Plaintiffs have not demonstrated that "Siemens AG has the requisite control over Siemens Austria to satisfy the factually intensive considerations a court applies when deciding issues of legal 'possession, custody or control' under Rule 34." (Defs.' Response at 12.) Defendants argue that Siemens AG and Siemens Austria are distinct entities and that Siemens AG does not have legal control over Siemens Austria. They point to Judge Scheindlin's determination, rendered in the context of the jurisdictional decision, that Siemens Austria is not a "mere department" or alter ego of Siemens AG. See Ski Train I at 409-12. While some of the Court's factual findings in that decision may have relevance to this Court's determination, Plaintiffs correctly note that the tests for determining whether a corporate entity is the alter ego or a "mere department" of another, are distinct from the issue of whether a parent has legal or practical access to its subsidiary's documents.

"Siemens AG is a German corporation that has its principal place of business in Munich. It is one of the world's largest electrical engineering and electronics manufacturers, and employs approximately 443,000 people in 193 companies." Ski Train II at 380. Siemens Austria is a wholly-owned subsidiary of Siemens AG,

which "manufactures and sells a broad range of electrical and electronic equipment products, systems and services under the Siemens brand name and other brand names." Ski Train I at 405 (internal citations omitted); see also Deposition of Manfred Donz, dated Nov. 14, 2005 ("Donz Dep."), Exhibit ("Ex.") J to Declaration of Jay J. Rice, Esq., dated Jan. 13. 2005 ("Rice Decl."), at 25.) Siemens Austria is Siemens AG's largest subsidiary in Europe. See Ski Train I at 405. Siemens AG's complete ownership of Siemens Austria suggests that the first factor in the parent-subsidiary control test tips in Plaintiffs' favor.

Judge Scheindlin has already determined that the two companies do not operate as a single entity and that they observe all of the legal formalities of distinct companies. See id. at 410-11. Moreover, Defendants argue, and Plaintiffs have not demonstrated otherwise, that under Austrian law the owner of Siemens Austria is not entitled to give instructions to the managing board of Siemens Austria. (See Defs.' Response at 15.) Thus, the second factor in the test tips in Defendants' favor.

As to the third factor, Plaintiffs argue that the two companies exchange documents in the ordinary course of business. For example, the parent company distributes circulars to officials of its subsidiaries, and the regional subsidiaries submit reports to Siemens AG on their business-planning, budgets, and financial statements. (See Pls.' Brief at 16.) There is, however, no

14

evidence that in their day-to-day business transactions the companies exchange documents; nor is there any evidence that they have exchanged documents relating to the issues in this lawsuit.

As to the last factor in the test, although Siemens Austria does sell some of the products manufactured by Siemens AG, there is no evidence that it acts as the agent of Siemens AG in the legal sense. The transactions between the two companies are conducted on an "arms length basis," and Siemens Austria does not appear to directly perform services for Siemens AG. See Ski Train I at 411; compare Ski Train II at 385-86 (holding that Siemens Corp. in New York acted as agent for Siemens AG where it was 100% owned by parent, engaged primarily in services for Siemens AG, served as a holding company for the parent, and executed transactions for the parent).

Thus, considering the four factors commonly applied to assess parent control of the documents of a subsidiary, two factors appear to tip in Plaintiffs' favor and two favor Defendants. However, additional evidence is available which further elucidates the issue. Although the evidence demonstrates that Siemens AG cannot legally compel Siemens Austria to produce its documents, there is evidence which strongly suggests that, as a practical matter, Siemens AG can secure documents from Siemens Austria. Plaintiffs point out that the shareholders of Siemens AG are responsible for appointing the Siemens Austria Supervisory Board, which has the

power to monitor and control the Management Board of Siemens Austria, which is responsible for the day-to-day operation of the company. (See Pls.' Brief at 14.; Donz Dep. at 28-29.) Indeed, as the only shareholder of Siemens Austria, Siemens AG elects Siemens Austria's Board of Directors, examines and approves it reports and annual accounts, and adopts bylaws for the corporation. (See V Circular No. 10/95, dated July 11, 1995 ("V Circular 10/95"), attached as Ex. M to Rice Decl., at 2.) Moreover, if Siemens Austria sought to undertake a major business endeavor outside of its normal course of business, it would require the approval of a committee of the Siemens AG Board. (See Donz Decl. at 60-62.) In addition, a number of individuals hold management positions in both companies. For example, the CEO and president of Siemens AG was the chairman of the Supervisory Board of Siemens Austria. (See Pls.' Brief at 14; Donz Dep. at 34-35.) Moreover, the Central Managing Board of Siemens AG has made recommendations for the appointment of executives at Siemens Austria. (See Donz. Dep. at 82.)

In addition, the Managing Board of Siemens AG has established basic principles for the coordination of the activities of its foreign subsidiaries. (See V Circular 10/95 at 2-3.) While those principles make clear that "the companies abroad are legally independent units which are governed by the legal systems and statutes of the countries in which they are formed or are located.

16

. . . Siemens AG can only exercise influence on the companies abroad in its capacity as a shareholder (direct or indirect) in accordance with local laws . . ." (id. at 1), the principles also contain a clear vision of Siemens as a global business, requiring cooperation and coordination among its many parts. (See id.) ("Even though the companies abroad are legally independent, and without compromising that legal independence, they are to be seen as parts of Siemens and therefore parts of the Siemens global business and organizational structure. In the performance of their business it is essential, therefore, that there be cooperation among the many parts of Siemens . . . .") One means of coordination is by having representatives of Siemens AG on the governing bodies of the subsidiaries. (See id.) Moreover, planning for the regional companies, such as Siemens Austria, is done with a member of the Corporate Executive Committee of the parent corporation. (See V Circular No. 8/97, dated July 7, 1997 ("V Circular 8/97"), attached as Ex. N to Rice Decl., at 2.)

A document containing revised general principles, issued by the Chief Executive Officer of Siemens AG, in 1997, calls for global entrepreneurs from the Siemens Groups and regional entrepreneurs from the Regional Companies, such as Siemens Austria, working together and "bear[ing] joint business responsibility." (Id. at 1.) "The organizational structure of Regional Companies is specified by the management of the respective company in

coordination with the responsible member of the Corporate Executive Committee." (Id. at 2.) Overall planning for Regional Companies is handled by the Regional Companies together with a member of the Corporate Executive Committee, and is decided upon by the Corporate Executive Committee. Uniform information processes between Groups and Regional Units are established according to central management regulations. Regional Units are under the supervision of a member of the Corporate Executive Committee, which appoints a Siemens spokesperson to ensure a coordinated approach to all essential, common issues. The Siemens spokesperson "is responsible for the formulation of a consistent regional policy that is coordinated with the respective Regional Units and the Groups, and he represents the specific regional interests before the Corporate Executive Committee." (Id. at 3.) The principles for international cooperation state that "[t]he interests of the individual company units are subordinate to the common interests of the entire Company." (Id.) The central corporate Groups grant sales rights to the Regional Units. Therefore, when Siemens Austria entered into a contract for the renovation of the Kaprun train, it is believed to have employed the products of a division of its parent company, Siemens AG, although it could modify those products to address specific customer needs. (See Donz Dep. at 66-69.) The Regional Units require the consent of a central corporate Group to sell outside the region or to market products from other vendors. (See

V Circular 8/97 at 3.)  Finally, "the Corporate Executive Committee
. . . regularly receive[s] reports on the regional strategy and on
medium-term business planning, budgets and the financial statements
drawn up by Regional Companies." (Id. at 2.)

Viewing the totality of these facts, and in light of the 100%
ownership of Siemens Austria by Siemens AG, the Court concludes
that the only reasonable conclusion to draw is that if Siemens AG
needed the assistance or cooperation of Siemens Austria in a matter
of concern to the company, it would receive such assistance, be it
in the form of providing documents in Siemens Austria's custody, or
otherwise.  As reflected in the principles of cooperation, Siemens
Austria regularly provides planning and budgetary documents to the
parent.

Accordingly, Siemens AG's document production must be
supplemented with responsive documents in the custody of its
wholly-owned subsidiary. See Dietrich, 198 F.R.D. at 402 ("the case
law arising in the parent-subsidiary context supports the
conclusion that [a corporate party] has control over the sought-
after documents under either a 'legal right' theory or a more
pragmatic approach focusing on practical ability to obtain
documents"); Twentieth Century Fox, 2002 WL 1835439, at *4
("Numerous courts have concluded that a parent corporation has a
sufficient degree of ownership and control over a wholly-owned
subsidiary that it must be deemed to have control over documents

19

located with that subsidiary."); cf. Hunter Douglas, 1999 WL 14007, at *3 ("If the nature of the relationship between the parent and its affiliate is such that the affiliate can obtain documents from its foreign parent to assist itself in litigation, it must produce them for discovery purposes.").

B. Depositions

Plaintiffs seek the depositions of a number of Siemens Austria employees as fact witnesses, making the same argument they made with respect to the production of documents – that they are within the control of Siemens AG and therefore Siemens AG must produce them. (See Pls.' Mem. at 18-19.) The Court disagrees.

Unlike the language of Rule 34, Rule 30 of the Federal Rules of Civil Procedure does not require a party to litigation to produce persons for deposition who are merely alleged to be in the party's control. Rather, a party or any other person can be noticed for deposition, and subpoenaed if necessary. If the person sought for deposition is not within the subpoena power of a United States court, then procedures according to international treaty must be followed.

The Siemens Austria employees are not employed by Siemens AG. Nor are they within the subpoena power of this or any other federal court. Therefore, they must be deposed in Austria according to

Austrian procedures.[5]

Plaintiffs cite one case in support of their application —
Twentieth Century Fox, 2002 WL 1835439, at *4. In that case, my
colleague, the Hon. Henry B. Pitman, U.S.M.J., concluded that a
corporate party responding to a Rule 30(b)(6) deposition must offer
a person who must testify on behalf of the corporation based on the
corporate party's knowledge of the specified subjects, as well as
the knowledge of its subsidiaries and affiliates. As an initial
matter, Plaintiffs' application is, in large part, factually
distinguishable because they have noticed the depositions of
Siemens Austria employees as fact witnesses. The Siemens Austria
employees are not employed by Siemens AG. There is simply no
authority for the proposition that a corporate party must produce
for deposition fact witnesses who are not employed by, and do not
speak for, that party.

Plaintiffs have also noticed Rule 30(b)(6) depositions of
Siemens AG, on topics relating to the renovation of the Kaprun
train, defects in its electrical systems, and the relationship of
the alleged defects to the fire on the train. It is clear that the
Siemens employees most knowledgeable on these subjects, if any,
would be employees of Siemens Austria. As discussed, there is no
evidence that Siemens AG was involved in the renovation of the

---

[5] Plaintiffs appear to have already commenced the processes
for securing depositions in Austria, as they requested letters
rogatory from Judge Scheindlin.

Kaprun train or the installation of any parts on the Kaprun train; nor did it have any contractual dealings with the Austrian entity which owned the train. Plaintiffs appear to argue that a Siemens AG employee must be produced for deposition and prepared to testify as to matters in which Siemens Austria may have been involved. In essence, Plaintiffs' position is that what is known by Siemens Austria is "known or reasonably available to" Siemens AG. Fed. R. Civ. P. 30 (b)(6). Plaintiffs cite to a single authority in support of this proposition — once again, the decision in Twentieth Century Fox.

With all due respect to my learned colleague, on the facts of this case, the Court will not adopt the holding in Twentieth Century Fox. All the knowledge of Siemens Austria is not "reasonably available" to Siemens AG. It is one thing to require a corporate parent to produce documents in the possession of its foreign subsidiary, when, as a practical matter, it is able to secure those documents. It is simply not comparable to require a corporate parent to acquire all of the knowledge of the subsidiary on matters in which the parent was not involved, and to testify to those matters in a manner which binds the parent, a separate legal entity. In this regard, Plaintiffs are attempting an end-run around the District Court's decision which dismissed Siemens Austria as a party to this action, concluding that Siemens Austria and Siemens AG were distinct legal entities.

Finally, Plaintiffs seek to depose Heinrich Von Pierer, the recently retired Chief Executive Officer and current Chairman of Siemens AG's Supervisory Board, and Jürgen Radomski, the Chief Personnel Officer, member of the Corporate Executive Committee, and member of the Managing Board of Siemens AG. Defendants oppose the depositions, arguing that these senior executives do not have any unique knowledge relevant to this action, and that deposing them would be disruptive to Defendants' business and is a form of harassment. Plaintiffs appear to concede that these executives are unlikely to have knowledge relating to the components in the Kaprun train, but argue that they do have knowledge that may help establish that Siemens AG and Siemens Austria are a single enterprise. (See Pls.' Brief at 19-20.)

Courts disfavor requiring the depositions of senior executives unless they have personal knowledge of relevant facts or some unique knowledge that is relevant to the action. See Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 203 F.R.D. 98, 102 (S.D.N.Y. 2001); Tri-Star Pictures, Inc. v. Unger, 171 F.R.D. 94, 102 (S.D.N.Y. 1997); Wertheim Schroder & Co. v. Avon Prods., Inc., No. 91 Civ. 2287 (PKL), 1995 WL 6259, at *2 (S.D.N.Y Jan. 9, 1995); Consol. Rail Corp. v. Primary Indus. Corp., Nos. 92 Civ. 4927 (PNL), 92 Civ. 6313 (PNL), 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10, 1993). Plaintiff has had an opportunity to examine Mr. Donz on the subject of the relationship between Siemens

AG and Siemens Austria.   While the Court is not prepared to preclude any further discovery on the issue, if Defendants prefer to proffer a Rule 30(b)(6) witness to testify on behalf of the corporation, other than the two executives whose depositions were noticed, there can be no harm to Plaintiffs.   Alternatively, the parties may agree that a set of focused interrogatories would best address the subject.

Accordingly, Plaintiffs' motion to compel the noticed depositions is denied.

SO ORDERED.

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: May 16, 2006
       New York, New York

Copies mailed to all counsel.